UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RICK C. SASSO, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:19-cv-298 JD |
| | ) |
| WARSAW ORTHOPEDIC, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## **OPINION AND ORDER**

This case is another iteration of a licensing dispute between Dr. Rick Sasso and Medtronic. In 1999 and 2001, Dr. Sasso licensed certain inventions used in spinal surgery to Medtronic,[1] which manufactures spinal implants. The parties later disputed the royalty payments due under those contracts, leading Dr. Sasso to sue in state court. Medtronic tried to remove or dismiss that action, arguing that the claims relied on issues of patent law subject to the exclusive jurisdiction of the federal courts. The state and federal courts disagreed, and the action proceeded in state court to a judgment in Dr. Sasso's favor.

Dr. Sasso then filed this follow-on action in state court, seeking to compel an audit and to recover any royalties that came due after the period encompassed in the state judgment. Medtronic asserted counterclaims and removed this action, again arguing that the claims invoke exclusive federal patent jurisdiction. Dr. Sasso moved to remand for lack of subject matter jurisdiction. The Court grants the motion. None of the claims necessarily raise disputed and substantial issues of patent law, so the Court lacks subject matter jurisdiction.

---

[1] The Court uses "Medtronic" to refer to the defendants and their predecessors, as the distinctions among the entities are immaterial here.

# I. FACTUAL BACKGROUND

Dr. Sasso is a surgeon who has created a number of inventions for use in spinal surgeries. He has licensed some of those inventions to Medtronic, a spinal implant manufacturer. Two of those licensing agreements are relevant here. First, in December 1999, Dr. Sasso and Medtronic's predecessor entered a licensing agreement for a screw delivery system Dr. Sasso invented. Pursuant to the agreement, Dr. Sasso transferred his rights to the invention and all related intellectual property rights to Medtronic. In exchange, Medtronic agreed to pay Dr. Sasso a royalty of 2.5% of its net sales of the medical device. Section 4 of the agreement called for those royalties to be paid "until expiration of the last to expire of the patent(s) included in the Intellectual Property Rights, or seven (7) years from the Date of First Sale of the Medical Device, if no patent(s) issue." A separate provision, Section 7, also defined the term of the agreement, stating that the agreement "shall expire upon the last to expire of the patents included in Intellectual Property Rights, or if no patent application(s) issue into a patent having valid claim coverage of the Medical Device, then seven (7) years from the Date of First Sale of the Medical Device." A patent application was then filed for the invention, and two patents issued following that application.

In July 2001, the parties entered a similar licensing agreement for a different invention, which they call the "Vertex" system. In this agreement, Dr. Sasso again assigned his interest in the intellectual property to Medtronic in exchange for royalty payments. The agreement called for him to receive 2% of the net sales of the medical device for eight years from the date of its first sale. However, "if the Medical Device is covered by a valid claim of an issued U.S. patent arising out of the Intellectual Property Rights," then the royalty payments would be due "for the life of the patent."

2

A dispute later arose over the royalty payments under those agreements. Dr. Sasso sued in state court in 2013, alleging that Medtronic breached the 2001 Vertex Agreement. Medtronic removed the case to federal court, arguing that the breach of contract claim arose under the federal patent laws because it depended on whether the products were covered by a valid patent. The court disagreed and remanded the case to the state court, which also denied a motion to dismiss on that same basis for lack of jurisdiction. Dr. Sasso later amended his complaint in that case to add a claim for breach of the 1999 Screw Delivery System Agreement. Medtronic again moved to dismiss, arguing that the claim fell within the exclusive patent jurisdiction of the federal courts, but the state court disagreed and denied the motion. The case then proceeded to trial, at which the jury found in Dr. Sasso's favor as to both agreements and awarded damages of over $32 million on the Vertex Agreement and almost $80 million on the Screw Delivery System Agreement.[2]

After the judgment in that case, Dr. Sasso requested an audit to determine if Medtronic was continuing to make sales of products subject to the agreements and if it was paying royalties on those sales as required. Medtronic did not oblige, so Dr. Sasso filed suit in state court. His complaint invoked provisions in both of the agreements that allowed him to conduct audits once per year, at his own expense, to ensure compliance. The conclusion of his complaint also requested that the court order Medtronic "to account for and pay additional amounts due if shown due by the audit." Medtronic answered and also filed counterclaims. Its counterclaims

---

[2] In the meantime, Medtronic filed a declaratory judgment action in this Court, contending that Dr. Sasso was not entitled to any damages on the Screw Delivery System Agreement because the medical devices were not covered by any valid patent claims. After the state court entered judgment in Dr. Sasso's favor on that same issue, the Court declined to entertain the declaratory judgment action and dismissed that case without prejudice. Medtronic's appeal from that judgment is still pending.

seek declaratory judgment that Dr. Sasso is not entitled to conduct audits and is not entitled to further royalties. The basis for those claims is that the agreements have each terminated because no valid patent covers any medical devices subject to those agreements. Medtronic then filed a notice of removal to this Court, asserting that both Dr. Sasso's claims and its counterclaims invoke the exclusive patent jurisdiction of the federal courts. Dr. Sasso disagrees and moved to remand this case to state court.

## II. STANDARD OF REVIEW

Federal district courts have exclusive jurisdiction over "any civil action arising under any Act of Congress relating to patents[.]" 28 U.S.C. § 1338(a). This applies most plainly when federal law creates the cause of action asserted, such as when a party sues for patent infringement. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). The Supreme Court has also recognized narrow circumstances in which even causes of action created by state law will arise under an Act of Congress relating to patents. *Id.* In *Gunn v. Minton*, the Supreme Court outlined a four-part test for those claims: "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal–state balance approved by Congress." 568 U.S. at 258.

A patent issue is "necessarily raised" only if "patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). "If 'on the face of a well-pleaded complaint there are reasons completely unrelated to the provisions and purposes of the patent laws why the plaintiff may or may not be entitled to the relief it seeks,' then the claim does not 'arise under' those laws." *Id.* (quoting *Franchise Tax Bd. v. Const. Laborers Vacation Tr.*, 463 U.S. 1, 26 (1983)) (internal alterations omitted). "Thus, a claim supported by alternative theories in the complaint may not form the basis for § 1338(a)

4

jurisdiction unless patent law is essential to each of those theories." *Id.* In other words, if a claim rests on both patent and non-patent theories, then patent law is not necessarily raised and the claim does not invoke federal patent jurisdiction.

"Substantial" also has a narrow meaning in this context. A patent issue is not substantial just because it is important to the parties in the immediate suit; "that will *always* be true when the state claim necessarily raises a disputed federal issue[.]" *Gunn*, 568 U.S. at 260. Instead, the substantiality elements looks to "the importance of the issue to the federal system as a whole." *Id.* The Federal Circuit has identified several factors that inform this inquiry. *Inspired Dev. Grp., LLC v. Inspired Prods. Grp., LLC*, 938 F.3d 1355, 1364 (Fed. Cir. 2019). It has held that a "substantial federal issue is more likely to be present if: (a) a pure issue of federal law is dispositive of the case, (b) the court's resolution of the issue will control numerous other cases, [or] (c) the Government has a direct interest in the availability of a federal forum to vindicate its own administrative action." *Id.*

### III. DISCUSSION

Medtronic argues that both Dr. Sasso's claims and its counterclaims trigger federal patent jurisdiction for both the 1999 Screw Delivery System Agreement and the 2001 Vertex Agreement. Dr. Sasso's claims seek audits under both agreements, and also seek an order requiring Medtronic to pay any additional amounts if shown due by the audits. Medtronic's counterclaims seek declarations that Dr. Sasso is not entitled to audits and is not entitled to any further royalty payments because the agreements have terminated, a question it asserts depends on the validity and coverage of patents.

In assessing jurisdiction over a declaratory judgment claim, courts look "not to the declaratory judgment complaint, but to the action that the declaratory defendant would have brought." *Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*, 599 F.3d 1277, 1283 (Fed. Cir.

2010) (internal quotation omitted). The Court thus need not distinguish between Dr. Sasso's claims and Medtronic's counterclaims, as even the declaratory judgment counterclaims are evaluated through the lens of whether the mirror-image claims for affirmative relief would arise under the patent laws. *Id.*; *Speedco*, 853 F.2d at 912. In both instances, the question is whether Dr. Sasso's claims against Medtronic invoke patent jurisdiction. The fact that Medtronic would defend against those claims by raising issues of validity and claim coverage, and has requested declaratory judgments on the merits of those specific defenses, is thus not controlling. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1578 (Fed. Cir. 1993) ("[A] plaintiff may not satisfy the well-pleaded complaint rule simply by filing a declaratory judgment complaint that on its face requires resolution of a question of patent law if a direct complaint for redress would not otherwise invoke the patent laws."); *Speedco, Inc. v. Estes*, 853 F.2d 909, 912 (Fed. Cir. 1988) ("[I]f, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." (quoting *Franchise Tax Bd.*, 463 U.S. at 16)); *see also Lab. Corp.*, 599 F.3d at 1282 ("Under the well-pleaded complaint rule, 'arising under' jurisdiction is determined from the plaintiff's statement of his or her own claim unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose.").

Accordingly, the Court evaluates, as to each agreement, whether those claims necessarily raise a disputed and substantial issue of patent law capable of resolution in federal court without disrupting the federal–state balance approved by Congress.

**A.     1999 Screw Delivery System Agreement**

Dr. Sasso first asserts a claim under the 1999 Screw Delivery System Agreement. He argues that royalty payments are still due, that he is entitled to conduct an audit to verify those payments, and that Medtronic has breached the contract by failing to make those payments.

6

Medtronic argues that the agreement terminated years ago and that no further royalty payments are due.

This disagreement centers on a dispute over which provision in the Agreement governs the term of royalty payments. Medtronic argues that the payments' duration is governed by Section 7, which refers in part to whether a patent "having valid claim coverage" of the medical device has issued. If so, the agreement runs for the life of the patent; if not, the agreement expires seven years from the first sale of the medical device, which has long since passed. Medtronic argues that the patent claims in question are either invalid or do not cover the products at issue, so the Agreement terminated already and no further royalties are due. Medtronic thus argues that this provision requires resolving both the validity and construction of the patent claims and determining whether the products in question fall within the scope of those claims, thus triggering patent jurisdiction. *See Jang v. Boston Sci. Corp.*, 767 F.3d 1334 (Fed. Cir. 2014).

Dr. Sasso disagrees. He argues that the duration of royalty payments is governed instead by Section 4, which says that payments are due "until expiration of the last to expire of the patent(s) included in the Intellectual Property Rights," or for seven years from the date of the first sale "if no patent(s) issue." Under that provision, the only relevant factors are the fact that a patent issues and the date it expires; unlike Section 7, it does not refer to whether a patent has "valid claim coverage." Thus, Dr. Sasso argues, his claim does not require resolving any issues of patent law—if (as is undisputed) a patent issued, then royalty payments are due for the life of the patent, regardless of whether the patent is later determined to be invalid or whether any products fall within its coverage. Under that theory, it would not be necessary to resolve any issues of patent law. *See Inspired Dev.*, 938 F.3d at 1363.

7

The existence of this threshold dispute over contract interpretation—an issue of state law—shows that the patent issue is not "necessarily raised." A patent issue is necessarily raised only if patent law is necessary to every theory of relief, *Christianson*, 486 U.S. at 810, and Dr. Sasso's primary theory (indeed, the only theory he asserts in his complaint) does not raise a question of patent law. Medtronic argues that its interpretation is correct and Dr. Sasso's is wrong, so the agreement as properly understood requires valid claim coverage. But that is just an argument that the non-patent theory should be resolved in Medtronic's favor on the merits. That doesn't change the fact that Dr. Sasso asserts a non-patent theory as his theory of relief. That theory is not frivolous, either. To the contrary, the state court agreed with Dr. Sasso and held that the "amount of money to be paid under the Agreement and the term depend on the issuance of patents and their expiration, not their validity." [DE 20-22].

This Court need not decide whether that was right or wrong. Deciding whether patent law is necessarily raised does not require a court to adjudicate any non-patent theories to see if the plaintiff will prevail on those bases; the inquiry looks to the "well-pleaded complaint, not the well-tried case." *Christianson*, 486 U.S. at 814. And if, on the face of a well-pleaded complaint, "there are reasons completely unrelated to the provisions and purposes of the patent laws why the plaintiff may or may not be entitled to the relief it seeks," the patent issue is not necessarily raised. *Id.* at 810. The fact that Dr. Sasso asserted a non-patent theory as the basis for his claim is thus enough to defeat this element, even though he may or may not ultimately be entitled to relief on that theory.[3]

---

[3] Though disputes over contract interpretation can sometimes be resolved at the pleading stage, they will sometimes require extrinsic evidence and have to be resolved at trial. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) ("[W]hen a contract provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the

8

The fact that the parties actually litigated patent issues in the state case does not show otherwise. Again, a patent issue is not "necessarily raised" if a claim rests on both patent and non-patent theories. *NeuroRepair, Inc. v. The Nath Law Grp.*, 781 F.3d 1340, 1345 (Fed. Cir. 2015) ("A plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue." (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc))). A claim with both those theories can thus proceed in state court. The patent theory will still have to be litigated, though. That might require the state court to issue claim-construction rulings or decide the validity of a patent. But *necessarily raised* does not mean *actually raised*, so the fact that patent issues were actually litigated and decided in state court does not mean that the patent issues were necessarily raised in the relevant sense. *Speedco*, 853 F.2d at 913 ("[S]tatutory limitations on the jurisdiction of . . . the federal district courts, in conjunction with the well-pleaded complaint rule, can and do result in state courts resolving patent issues."); *see Lab. Corp.*, 599 F.3d at 1285. Here, Dr. Sasso is pursuing a theory that does not depend on the resolution of a federal issue—that the term of royalty payments is governed by Section 4 of the agreement, which looks only to the fact that a patent issued and the date it expires—so the patent issue is not necessarily raised. That distinguishes this case from *Jang*, on which Medtronic heavily relies, as it was undisputed there that the royalties turned on the coverage of patents. *Jang*, 767 F.3d at 1136 ("Jang's right to relief on the contract claim as asserted in the complaint depends on an issue of federal patent law—whether the stents sold by petitioners would have infringed Jang's patents." (internal quotation and alterations omitted)).

---

contract."). Having to resolve those sorts of merits questions as part of a court's jurisdictional inquiry would thus be anomalous and impractical.

Medtronic also argues that patent issues affect the scope of products subject to the royalty payments, but patent issues are even farther removed from that question. Under the agreement, royalty payments are due on net sales of the "Medical Device." Medical Device is defined as any device including the "Invention," which in turn is defined as "any product, method or system relating to a facet screw instrumentation and a headless facet screw fixation system . . . ." Those provisions do not refer to patents at all, much less to the validity or coverage of any patents. The patent application or other patent-related documents may well provide evidence of what the Invention was, but the Invention is not defined by reference to the existence or coverage of any patents, so patent issues are not necessarily raised in that sense, either. *Lab. Corp.*, 599 F.3d at 1284 ("[T]he mere presence of a patent as relevant evidence to a claim does not by itself present a substantial issue of patent law."); *Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.*, 414 F.3d 1358, 1365 (Fed. Cir. 2005).

In addition, there has been a development since the state case was filed that independently precludes jurisdiction in this case: Medtronic petitioned the patent office to invalidate the relevant claims of its own patents, which the patent office did. Thus, there is no longer any dispute about the validity of those patent claims. To the extent Dr. Sasso's claims require the patent claims to be valid, the patent office has already decided they are not. For the same reason, patent questions are not "substantial" in the relevant sense. Medtronic is not going to file infringement suits on patent claims it asked to invalidate, so a decision in this case would not control any other cases, and allowing this suit to proceed in state court would not create any risk of inconsistent judgments. Jurisdiction is evaluated based on the facts as they existed at the time a complaint was filed, so the patents' invalidation may not affect whether the state court had jurisdiction in the previous action. *Jang*, 767 F.3d at 1338. The patents were invalidated before

this action was filed, though, so that development does factor into the jurisdictional analysis in this case.[4]

Medtronic's only response on that point is to note that it didn't ask to cancel some other claims in the relevant patents. It thus suggests that Dr. Sasso might choose to pursue those patent claims if necessary. However, Medtronic cancelled all of the patent claims that Dr. Sasso pursued at trial in the state case. To the extent there are other patent claims he might invoke, Medtronic has not shown how those patents claims are *necessarily* raised in this case, and the fact that Dr. Sasso proceeded to trial without them—and won—indicates they are not. This point further illustrates that the real crux of this case is an issue of contract interpretation: if Dr. Sasso is right, then questions of validity and claim coverage don't matter, and if Medtronic is right, the patent issues have likely already been decided. The possibility that Dr. Sasso would invoke a peripheral patent claim as a fallback argument in the event he loses on that issue does not mean that patent law is necessarily raised in this action. The Court therefore finds that the claims relating to the 1999 Screw Delivery System Agreement do not invoke federal jurisdiction under § 1338.[5]

**B.      2001 Vertex Agreement**

Dr. Sasso also seeks an audit and further royalty payments under the 2001 Vertex Agreement. Unlike the 1999 Screw Delivery System Agreement, there is no dispute that

---

[4] For that reason, the Court declines to wait further on the Federal Circuit's decision in the related declaratory judgment case, as Medtronic proposes in part in its motion to stay. If the Federal Circuit were to hold in that case that patent jurisdiction is not present, that would further support this outcome. But even a holding to the contrary would not necessarily control in this case. The patents were invalidated after the suit underlying that appeal was filed, and thus would not affect the existence of jurisdiction in that case, but would still be relevant in this case.

[5] Dr. Sasso offers other arguments in support of remand, including that res judicata provides an additional theory on which he could prevail on the merits in this case without having to resolve any patent issues. The Court need not reach those other arguments, though.

royalties under the 2001 Vertex Agreement depend on whether the devices are "covered by a valid claim of an issued U.S. patent." Also unlike the previous agreement, though, there is also no dispute that the devices at issue in this agreement are covered by at least one valid patent—Medtronic admits that its '621 patent is valid and covers the devices.

The dispute, rather, is whether the '621 patent is encompassed in the Agreement. The Agreement provides for royalty payments on products covered by a valid claim of an issued patent "arising out of the Intellectual Property Rights." Medtronic argues that the '621 patent is not included because the only patent referred to in the Intellectual Property Rights provision is an application for what became the '491 patent. Dr. Sasso disagrees and argues that the agreement defines the Intellectual Property Rights broadly. He notes that "Intellectual Property Rights" is defined to include not only patents, but also "any and all know-how, technology and any other intellectual property right with respect to the Invention." The Invention, in turn, includes "any know-how, and/or technical information relating to the posterior cervical rod system in the possession of Dr. Sasso, or hereinafter developed by Dr. Sasso in the course of his providing services to [Medtronic] pursuant to Section 6," which requires Dr. Sasso to assist in developing and evaluating the devices. Dr. Sasso argues that the '621 patent falls within those broad definitions and arises out of those Intellectual Property Rights, such that royalties are due for the life of that patent.

Regardless of which side prevails on this issue, resolving this dispute does not require resolving any disputed patent issues; it depends entirely on the interpretation of a contract and its application to a particular set of facts. As with the previous agreement, Medtronic argues that Dr. Sasso should lose on the merits of this theory. It hasn't argued, however, that resolving this theory requires deciding a patent issue that is "actually disputed"—the second element of *Gunn's*

jurisdictional test. Medtronic admits that the '621 patent is valid and covers the devices in question, and defends this theory solely on contractual grounds. This theory thus does not require the resolution of any disputed patent issues. Granted, Dr. Sasso also argues in the alternative that the devices are covered by other valid patents, so patent issues may have to be litigated to resolve those alternative theories. *Speedco*, 853 F.2d at 913. But because Dr. Sasso has offered at least one theory that does not require resolving a disputed issue of patent law, this claim does not necessarily raise a patent issue that is both actually disputed and substantial. *Inspired Dev.*, 938 F.3d at 1363; *Lab. Corp.*, 599 F.3d at 1285.

The Court therefore finds, consistent with the decisions of the state and federal courts on this identical question in the previous case, that this claim does not invoke patent jurisdiction under § 1338. And because there is no basis for federal subject matter jurisdiction over any of the claims in this case, the Court remands this case to state court. 28 U.S.C. § 1447(c).

**C.     Attorney Fees**

Dr. Sasso finally requests an award of attorney fees. By statute, "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The Supreme Court has held that absent unusual circumstances, "courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The Court does not find that to be the case here. Although the Court disagrees with Medtronic that this case invokes patent jurisdiction, the jurisdictional issues in this case are difficult and complex and are still being litigated in state and federal courts of appeals. Medtronic's arguments, though unsuccessful, were not objectively unreasonable, and the Court does not find that an award of attorney fees is appropriate.

## IV.  CONCLUSION

The Court GRANTS Dr. Sasso's motion to remand [DE 19] and REMANDS this action to Kosciusko Superior Court based on a lack of subject matter jurisdiction. The Court declines to rule on the pending motion to stay or motion to dismiss as to Medtronic plc, as those matter are more appropriately addressed by the state court on remand.

SO ORDERED.

ENTERED: March 4, 2020

                                                /s/ JON E. DEGUILIO
                                      Judge
                                      United States District Court